IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ECOSAVE AUTOMATION, INC., et al,

        Plaintiffs,

    v.

DELAWARE VALLEY AUTOMATION, LLC, et
al,

        Defendants.

CIVIL ACTION
NO. 20-5564

## MEMORANDUM OPINION

**Schmehl, J.  /s/ JLS**                                          **May 19, 2021**

## I.    INTRODUCTION

Before the Court is the motion for preliminary injunction of Plaintiffs, Ecosave

Automation, Inc., Ecosave, Inc., and Ecosave Holdings, Inc. Defendants are Delaware

Valley Automation, LLC ("DVA"), Energy Transfer Solutions, LLC ("ETS"), Michael

Haggerty, Jr., President of ETS, Matthew Dugan, and thirteen individual defendants, all of

whom recently left the employ of Ecosave Automation to take new roles with DVA. On

November 6, 2020, Plaintiffs filed a Complaint in this matter, as well as a Motion for

Temporary Restraining Order and Motion for Preliminary Injunction. On November 23,

2020, this Court granted Plaintiffs' temporary restraining order, and on January 7, 2021,

Plaintiffs filed an Amended Complaint.

Presently before the Court is Plaintiffs' Motion for Preliminary Injunction. Based

upon the parties' submissions and testimony elicited at the evidentiary hearing held in this

matter, injunctive relief if not warranted and this motion will be denied.

## II.    BACKGROUND

### A.  Ecosave

Ecosave Automation, Inc. ("ESA") is a wholly-owned subsidiary of
Ecosave, Inc. ("ESI"). P-22, ¶ 4. Ecosave Holdings, Inc. ("EHI") is the parent company
of ESI and ESA. P-22, ¶ 5. ESI provides energy-efficiency solutions for businesses and
has two sides to its business, efficiency and automation. P-1, p. 6. ESI operates its
automation business through ESA. P-22, ¶¶ 1-4. ESA designs, sells and services
temperature control and automation systems. P-1, pp. 8-10. ESI was formed when it
acquired the stock of DVL Automation ("DVLA") in 2013. Compl., ¶ 40; P-1, p. 12.
When ESI acquired DVLA, it retained all DVLA automation employees. P-1, p. 12.

ESA maintains that it uses proprietary standard operating procedures, tools and
methods which are unique from those of its competitors and which provide ESA with a
competitive advantage in the marketplace. Specifically, ESA lists the following as trade
secrets and confidential information: the identity of its customers and preferences of its
customers; the status of particular projects; design drawings; pricing-related information
such as labor and materials rates and the margins on particular jobs; the number of hours
required to complete a particular job; and customer-specific "clipping" files containing
sequences and methodologies for running particular buildings' systems; and energy
saving strategies. ESA's Proposed Findings of Fact, ¶ 36.

### B.  Defendants DVA, ETS and Haggarty

Delaware Valley Automation is a limited liability company that has three members:

Energy Transfer Solutions, Matthew Dugan and Joel Nace. P-248. Defendant Michael J. Haggarty is President of ETS. 2/26/21 hrg, p. 125. DVA is engaged in the building automation industry and is a competitor of ESA.

## C. Individual Defendants

Defendant Matthew D. Dugan ("Dugan") was President of ESA until his termination in 2020. Dugan was originally an employee of DVLA and owned a quarter of the company when it was acquired by ESI in 2013. 2/18/21 hrg, p. 32. In connection with ESI's acquisition of DVLA, Dugan received $243,810 in cash and $890,000 worth of stock in ESI. 3/2/21 hrg, p. 74. Dugan signed an Employment Agreement with ESI on July 16, 2013. P-10. This agreement committed him to work for three years with ESI. *Id*. The agreement did not include a noncompetition restriction, and there was also no prohibition against him doing business with any customer or prospective customer of Plaintiffs. *Id*. The agreement did include a two-year non-solicitation clause which restricted Dugan from directly or indirectly soliciting any Ecosave customer (identified as having done business with Plaintiffs in the 12 months preceding Dugan's termination) or prospective customer (solicited or identified as a prospect and with whom Dugan actually engaged during his employment). *Id*. at section 5.1(a)(i) and (ii). The non-solicitation restriction contained a carve-out that expressly permits Dugan to solicit, directly and indirectly, all customers and prospective customers with which or with whom Dugan conducted business prior to his employment with ESA. *Id.* The agreement also includes covenants not to a) solicit customers and prospective customers not to do business with Plaintiffs; b) solicit existing suppliers, vendors, or agents of Plaintiffs to terminate or take any action that would "reasonably be expected to negatively affect" the relationship with

Plaintiffs; and (c) solicit employees or consultants to terminate their employment or consulting relationship with Plaintiffs. *Id.*, at section 5.1(a) (iii), (iv) and (v). Dugan became a shareholder in DVA and serves as its Chief Executive Officer. P-351,¶ 4h.

Defendant Joel C. Nace was ESA's Sales Manager. He began his relationship with ESA through its predecessor DVLA on September 5, 2000. Nace resigned his employment with ESA on October 16, 2020, and became a shareholder in and President of DVA. 3/5/21 hrg, p. 14. Defendant Andrew Warwick was a Project Manager for ESA until his resignation on October 16, 2020. P-321. Warwick is now a Project Manager for DVA. P-68, ¶ 5. Defendant John K. Carey was an Engineering Manager for ESA until his resignation on October 16, 2020, and is now employed by DVA as an Engineering Manager. P-55, ¶ 5. Defendant John A. Crane was a Sales Engineer for ESA until his resignation on October 16, 2020 and is now employed by DVA as a Sales Engineer. P-56, ¶ 5. Defendant Harry J. Irrgang, Jr. was a Senior Project Manager for ESA until his resignation on October 16, 2020, and is now employed by DVA as a Senior Project Manager. P-149.

Defendant Lyle J. Gmoser was a Sales Engineer, Project Executive and Account Salesman for ESA until his resignation on October 16, 2020. Gmoser is now employed by DVA as an Account Executive. P-61, ¶ 5. Defendant Christian Sweeney was ESA's Network Operations Center Manager until his resignation on October 16, 2020, and he is now employed by DVA as Network Operations Center Manager. P-66, ¶ 5. Defendant Howard Weitzner was ESA's Design Engineer until his lay off from ESA in September of 2020. P-23, ¶ 29. Weitzner is now employed by DVA as a Project Engineer. P-69, ¶ 5. Defendant Matthew Davis was ESA's Chief Estimator until his resignation on October

16, 2020, and he is now employed by DVA as Chief Estimator. P-58, ¶ 5. Defendant William Van Ess was a Service Technician for ESA until his retirement on October 16, 2020. Van Ess briefly accepted employment with DVA, but is now retired. P-67, ¶ 5. Defendant Andrew J. Gilbert was an Operations Technician for ESA until his resignation on October 16, 2020 and is now employed by DVA as a Control Technician. P-60, ¶ 5. Defendant Joao A. Leonardo was a Service Technician for ESA until his resignation on October 16, 2020 and is now employed by DVA as a Controls Technician. P-64, ¶ 5. Defendant Nick Daniels was a Field Technician for ESA until his resignation on October 16, 2020 and is now employed by DVA as a Technician. P-57, ¶ 5.

Daniels, Davis, Gilbert and Weitzner each allegedly entered into contracts upon their hire with ESA that included a limited covenant not to compete during employment and for a period of six (6) months following the conclusion of same; non-solicitation clauses applicable during employment and for a period of twelve (12) months following the conclusion of same; and confidentiality clauses. P-15, ¶¶ 8, 12; P-12, ¶¶ 8, 12; P-13, ¶¶ 8, 12, P-14, ¶¶ 8, 12. Davis, Gilbert, Daniels and Weitzner are not engaged in sales on behalf of DVA, and no member of DVA's sales team has a non-solicitation agreement with ESA. 3/2/21 hrg, pp. 55-56.

**D. Formation of Delaware Valley Automation**

It is undisputed that Dugan and Nace began talks with Haggarty and ETS sometime in mid to late 2020 about forming a new company. As this new company would be doing the exact same type of work as ESA, it is inevitable that this company would be a competitor of ESA. Dugan approached ETS' Goodstein and Haggarty about such a start-up company in August of 2020. 2/26/21 hrg, pp. 49-50. Dugan, Goodstein and Haggarty

had multiple meetings and conversations about a potential new company throughout August and September of 2020. P-153; P-154; P-250; P-251; P-254. The parties discussed Dugan's non solicitation agreement prior to forming DVA, and Haggarty testified that he knew Dugan "would not be able to solicit." 2/29/21 hrg, pp. 51, 149-150.

On August 30, 2020, Dugan sent Goodstein a document that he had developed with Nace. P-152. ESA refers to this document as a business plan, while DVA states that it is merely a marketing document. This document stated "Ecosave/DVLA team-members become Delaware Valley Automation." P-152. The document references 18 people being "transferred" to DVA from ESA and describes DVA's target customers as those "with service contracts held with 30 day cancellation clause." P-152. The document also identified specific target customers, all of which were ESA customers. P-152. The plan also referenced that ESA's ALC license was set to expire in October of 2020. P-152. Dugan and Nace believed that because ESA's ALC license was set to lapse, DVA would be able to acquire such a license, which Goodstein admitted made DVA a more attractive business. 2/28/21 hrg, pp. 74-76, 79. There is no real dispute that DVA contacted numerous ESA customers in the days and weeks following the departing employees' resignations, and it is clear that DVA and the departing employees wanted to pick up as DVA where they had left off when they departed ESA.

### E.  The Departing Employees and the Mass Resignation

In late summer of 2020, Nace approached numerous ESA employees to let them know that he was looking to leave ESA and start a new company. He stated that this was done to "save" ESA's employees, as he alleged poor management, salary cuts, and reduced commission payments. 3/2/21 hrg, p. 70. ESA was having financial difficulties,

as evidenced by its financial statements for 2016 through 2019. Defs' Exhs 6 and 7. Further, in the summer of 2020, ESA informed sales personnel that it would not pay them commissions due on sales they had made over the past several years, and it was restructuring its sales commission to reduce compensation to personnel by 33%. 3/5/21 hrg, p. 3, Defs' Exh. D at 19.

Nace and Dugan had multiple meetings throughout the summer and fall of 2020 with the departing employees. P-104, P-105, P-107, P-109, P-112, P-155. Nace also assisted in coordinating the resignation of the departing employees, and on October 15, 2020, he sent an email to all departing employees with instructions regarding how to handle their resignations from ESA, including a sample resignation letter. P-106.

Crane also emailed all departing employees that same day, instructing them to back up their work phones to their iCloud that evening, so that "when you start your new phone up you will be able to log into your icloud and download your latest icloud backup." P-106. Upon resigning, some of the departing employees returned their ESA cell phones without unlocking them or providing password information and some returned them wiped clean of data. P-21, ¶ 9; 2/19/21 hrg, p. 72. None of the departing employees provided ESA with information to access their Cloud storage accounts. P-21, ¶ 13, 2/19/21 hrg, p. 64.

When DVA extended offers of employment, it instructed all future employees not to bring any of their former employer's documents or information with them. 2/26/21 hrg, p. 151. Then prior to starting employment at DVA, all prospective employees were again told not to bring any ESA documents or information with them to DVA. *Id.*, p. 57.

Nick Clift testified that no DVA employee had access to Ecosave's network after October 16, 2020. 2/26/21 hrg, pp. 5-9.

In October of 2020, the departing employees began compiling customer information files for ESA customers in folders labelled "Covid 19." P-21, ¶ 17-21. It is undisputed that the contents of these files were not limited to the subject of Covid-19. Further, Irrgang, Crane, Nace and Gmoser attempted to email these Covid-19 files to ESA's customers. P-21, ¶¶ 17, 21; P-158; P-219; P-1, 32. When some of the emails failed to send due to the size of the attachment, the departing employees made arrangements to drop USB sticks that contained these Covid-19 files off at the customers' locations. 3/2/21 hrg, p. 159. The departing employees then attempted to delete the Covid-19 files from ESA's system. P-21, ¶¶ 22-23; 12/2/20 hrg, pp. 32-33. After the departing employees resigned from ESA, they made efforts to obtain the Covid-19 files back from the ESA customers to whom they had been provided.

Some of the departing employees made statements that may have misled some ESA customers into believing that ESA was no longer in business. P-51; P-134; P-291; P-293. Further, Nace had clearly implied to some customers that DVA was a spinoff of ESA. P-50.

Nace communicated with ESA's clients after the mass resignation and informed them that DVA's ownership "includes our CEO Matt Dugan." P-50. However, there was no evidence presented that Dugan knew these emails were being sent, let alone participated in drafting or sending them. Nace specifically testified that Dugan was not involved in the drafting of such emails and that he did not tell Dugan about them. 3/5/21 hrg, p. 10.

### III.  **PROCEDURAL HISTORY**

On November 9, 2020, ESA filed suit against Defendants, bringing the following claims: (1) Breach of contract against Dugan, relating to his employment contract with Ecosave; (2) Breach of contract against Daniels, Davis, Gilbert and Weitzner relating to their alleged employment contracts with Ecosave; (3) Breach of contract against Warwick relating to his alleged employment contract with Ecosave; (4) Breach of fiduciary duty of loyalty against Nace, Gmoser, Van Ess, Davis, Irrgang, Warwick, Crane and Sweeney; (5) Aiding and abetting breaches of duty of loyalty against DVA, Dugan, Nace, ETS and Haggarty; (6) Tortious interference with contractual and business relationships against all Defendants; (7) Tortious interference with contractual relations with employees against DVA, Dugan, Nace, ETS and Haggarty; (8) Defend Trade Secrets Act claim against DVA, Dugan and the individual defendants; (9) Pennsylvania Uniform Trade Secret Act claim against DVA, Dugan and the individual defendants; (10) Computer Fraud and Abuse Act claim against Nace, Warwick, Crane, Gmoser and Sweeney; (11) Conversion of business information against DVA, Dugan and the individual defendants; (12) Unfair competition against all Defendants; (13) Civil conspiracy against all Defendants; and (14) Unjust enrichment against all Defendants.

ESA moved for injunctive relief, and on November 23, 2020, after a telephone hearing, the Court granted the majority of its requested relief in the form of a temporary restraining order. Specifically, the Court ordered Weitzner, Gilbert, Davis and Daniels to cease all activities on behalf of DVA, ETS or any other entity seeking to engage in competition with ESA, ordered all Defendants to cease soliciting or engaging in business

activities with ESA's customers, prospects, employees, vendors, and other business

partners, ordered all Defendants to cease making disparaging statements or

misrepresentations about ESA, as well as about DVA's relationship to ESA and the

former employees' employment status with ESA, ordered all Defendants to return to ESA

all of its confidential information and trade secrets and ordered all Defendants to not

disclose ESA's confidential information and trade secrets to any third party or use such

information for any purpose. ECF No. 20.

## IV.    LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to

succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The

"failure to establish any element . . . renders a preliminary injunction inappropriate."

*NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999). The movant

bears the burden of showing that these four factors weigh in favor of granting the

injunction. *See Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d

Cir. 1990). Plaintiffs must prove the first two factors (likelihood of success and risk of

immediate and irreparable harm), and if they should fail on either, their request must be

denied. *Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017).

A likelihood of success on the merits "requires a showing significantly better than

negligible but not necessarily more likely than not." *Reilly*, 858 F.3d at 179. "To establish

a reasonable probability of success on the merits, the moving party must produce

sufficient evidence to satisfy the essential elements of the underlying cause of action. *See*

*Punnett v. Carter*, 621 F.2d 578, 582–83 (3d Cir. 1980); *McCahon v. Pa. Tpk. Comm'n*, 491 F. Supp. 2d 522, 527 (M.D. Pa. 2007). In determining whether success is likely, the Court must look to the legal principles controlling the claim and the potential defenses available to the opposing party. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 264 (3d Cir.2000).

In addition, a "plaintiff seeking a preliminary injunction must make a "clear showing of immediate irreparable injury." *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 358 (3d Cir. 1980) (citation omitted). The injury must constitute "potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotation marks and citation omitted). The preliminary injunction "must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 801 (3d Cir. 1989).

The risk of harm must not only be irreparable but also imminent. *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989) ("establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a clear showing of immediate irreparable injury*"); ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987); *Cont'l Grp., Inc.,* 614 F.2d at 359). In order to be imminent, the injury cannot be remote or speculative; it must be poised to occur before the District Court can hold a trial on the merits. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 263-64 (3d Cir. 2000).

V.     **DISCUSSION**

ESA has set forth numerous claims in this matter and I will address each

separately below. As will be discussed, ESA did not meet its burden of proving the factors necessary for injunctive relief. Accordingly, its motion for a preliminary injunction must be denied.

## A. Trade Secrets

ESA brings trade secrets claims under the Pennsylvania Uniform Trade Secrets Act ("PUTSA") and the Defend Trade Secrets Act ("DTSA"). Under the PUTSA, the elements of a misappropriation of trade secrets claim are: "'(1) the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3) use of the trade secret, in violation of that confidence; and (4) harm to the plaintiff.'" *Accurso v. Infra-Red Servs., Inc.*, 2018 WL 924985, at *7-8 (E.D. Pa. Feb. 16, 2018) (*quoting Moore v. Kulicke & Soffa Indus., Inc.*, 318 F. 3d 561, 566 (3d Cir. 2003)). To state a claim under the DTSA, a plaintiff must show "(1) that they own a trade secret and (2) that the defendant misappropriated the trade secret." *Herley Industries, Inc. v. R Cubed Engineering, LLC*, 2021 WL 229322 (E.D. Pa. 2021). Both the DTSA and the PUTSA define "trade secret" as information that: "(a) the owner has taken reasonable means to keep secret; (b) derives independent economic value, actual or potential, from being kept secret; (c) is not readily ascertainable by proper means; and (d) others who cannot readily access it would obtain economic value from its disclosure or use." *Teva Pharm. USA, Inc. v. Sandhu*, 291 F.Supp.3d 659, 675 (E.D. Pa. 2018) (citing 18 U.S.C. § 1839(3); 12 Pa. Stat. § 5302)).

To prevail on a misappropriation of trade secrets claim, ESA must first establish the existence of a trade secret. *See Christopher M's Hand Poured Fudge v. Hennon*, 699 A.2d 1272, 1275 (Pa. Super. 1997). The alleged trade secret must be particular to ESA

and not to the industry itself and must not be available through an independent source such as customers. *National Risk Mgmt, Inc., v. Bramwell*, 819 F.Supp. 417, 429 (E.D. Pa., 1993).

There is clearly conflicting testimony as to whether trade secrets exist in this matter. ESA claims that its "BAS control sequences, proprietary design and build processes, the intimate and long-term knowledge developed as to each of ESA's customer's buildings (i.e., how they operate, what they need and how that translates into a business opportunity), and ESA's costs, including materials, labor rates, overhead, and pricing strategies, all qualify as trade secrets." Ecosave Proposed Concl. of Law, ¶ 17. However, Defendants offered testimony from Goodstein, Haggarty, Dugan, and Nace that the BAS industry is governed by industry standards and there are no trade secrets in the BAS business. 2/26/21 hrg, p. 53 (Goodstein); 2/26/21 hrg, pp. 141-142 (Haggarty); 3/2/21 hrg, pp. 46-47 (Dugan); 3/2/21 hrg, p. 167 (Nace). Further, there was testimony and documentary evidence presented that program files, as-built drawings, sequence of operations, submittal documentation and software are definitely customer records that are owned by the customer where the system is installed. 2/26/21 hrg, pp. 141-142, Defs' Exhs. 28, 30 and 31.

There was also conflicting testimony regarding "clipping files," which Nick Clift, IT Director at ESA, testified were the "secret sauce" of ESA's business that he, Nace and Dugan had several discussions about trying to protect from competitors. 2/26/21 hrg, p. 29. However, Nace testified that clipping files are not secret at all; rather, they were the "system backup that people use, technicians used, engineers used across the industry on a daily basis." 3/2/21 hrg, pp. 161, 167.

ESA had the burden to present sufficient evidence that it even possessed trade secrets worthy of protecting. It failed to meet that burden. I cannot find that ESA has a likelihood of proving any existence of trade secrets in this matter due to the amount of conflicting evidence on this issue; therefore, I cannot conclude that there is a likelihood of success on the merits of this claim.

Assuming, *arguendo,* that ESA did possess trade secrets worthy of protecting, ESA cannot produce sufficient evidence that Defendants misappropriated said trade secrets. First, ESA did not provide evidence that any defendant had taken any of ESA's documents with him when he left ESA. There is evidence that the departing employees looked at ESA's files, but no evidence has been presented that any files were copied by the departing employees. Further, ESA's IT Director admitted that no DVA employee had access to ESA's network after October 16, 2020. 2/26/21 hrg, pp. 5-9. ESA performed an analysis of the company laptops of Nace, Gmoser and Crane and said analysis produced no evidence of a single confidential record of ESA taken by Nace, Gmoser or Crane. There simply was no evidence presented that Defendants are in possession of ESA's alleged trade secrets. At most, ESA presented evidence that Nace, Gmoser and Crane accessed ESA files while employed by ESA, which is hardly improper.

ESA then argues that Defendants sent customer records to certain customers while Defendants were still employed by ESA, purportedly for Defendants to access and use once they were no longer with ESA. There is no dispute that this occurred, as Defendants admitted that they sent customer records to customers, as they believed that the records in question were owned by the customers. ESA has failed to provide evidence that the

customer files that were sent to customers contained trade secrets that were not the property of the customer to whom they were delivered. ESA did not present testimony from an expert in the industry as to what is a trade secret and what is the property of the customer. Also, ESA did not present any evidence that any defendant is currently in possession of any of its trade secrets, nor did it present evidence that any defendant has used or is currently using any of its trade secrets. Trade secrets "will not be protected by the extraordinary remedy of injunction on mere suspicion or apprehension of injury. There must be a substantial threat of impending injury before an injunction will issue." *National Risk Mgmt, Inc. v. Bramwell*, 819 F.Supp. 417, 429, 432 (E.D. Pa. 1993).

I find that there is no evidence of misappropriation of a trade secret, even assuming trade secrets existed in this matter. Therefore, there is not a reasonable likelihood of success on the merits of ESA's claims under the PUTPA and the DTSA. Accordingly, injunctive relief is denied as to those claims. As ESA has failed one of the first two factors for injunctive relief on its trade secrets claim, I do not need to address the other factors.[1]

## B. Breach of Contract

Under Pennsylvania law, to prevail on a claim for breach of contract, a plaintiff must prove: "'(1) the existence of a contract, including its essential terms[;] (2) a breach of the contract; and[ ] (3) resultant damages.'" *Liberty Fencing Club LLC v. Fernandez-Prada*, 2017 WL 3008758, at *7 (E.D. Pa. July 14, 2017) (*quoting Meyer, Darragh*,

---

[1] If I were to continue the analysis of the trade secrets claims I would find that ESA has failed to prove immediate and irreparable harm, as it failed to present evidence that any Defendant is currently using or threatening to use any trade secrets or confidential information. Further, Defendants' prior access to ESA laptops does not present a threat of immediate and irreparable harm, as it had occurred in the past.

*Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.,* 137 A.3d 1247, 1258 (Pa. 2016) (citations omitted)). A restrictive covenant is enforceable when it is: a) ancillary to an employment relationship between the parties to the covenant; b) supported by adequate consideration; c) reasonably limited in duration and geographic scope; and d) reasonably necessary to protect the employer's interests. *Volunteer Fireman's Ins. Servs., Inc. v. Cigna Prop. and Cas. Ins. Agency*, 693 A.2d 1330, 1337 (Pa. Super 1997).

First, there are numerous individual defendants in this case that had no restrictive covenant of any sort with ESA; therefore, these defendants cannot be liable for breach of contract. Those individuals are Defendants Nace, Carey, Irrgang, Van Ess, Leonardo, Crane, Gmoser and Sweeney.[2] ESA has presented no evidence of any sort of non-compete agreements as to those defendants. Accordingly, the analysis below pertains only to Defendants Dugan, Daniels, Davis, Gilbert, Weitzner, and Warwick.

First, I will analyze the situations involving Daniels, Davis, Gilbert, Weitzner and Warwick, five of the departing employees with alleged non-compete agreements. I find that these defendants did not breach any agreement that they may have entered with ESA and injunctive relief is denied as to those defendants. It is undisputed that Daniels, Gilbert

---

[2] Marcelo Rouco testified that it was his understanding that both Gmoser and Nace had entered into confidentiality agreements as well as non-competes when they were hired by DVLA in 2000 and 2004, respectively. 12/2/20 hrg, p. 15. Moreover, offer letters were produced from DVLA to both Nace and Gmoser reflecting that defendants would be asked to enter non-compete agreements at the completion of their internships. P-6 and P-7. Despite these offer letters stating "the nature of this position allows you access to confidential information, therefore, you will be required to sign a standard non-compete agreement upon completion of your internship," no executed agreements as to Nace and Gmoser were produced. *Id.* Further, Nace testified that he did not have any type of non-solicitation or non-compete agreement with ESA. 3/2/21 hrg, p. 138. Accordingly, I find that these two individual defendants did not have valid non-competes with ESA. The mere fact that Mr. Rouco believed these defendants had non-compete agreements does not create a valid contract.

and Weitzner executed offer letters upon commencing their employment with ESA that contained standard terms and conditions.[3] These terms and conditions included covenants not to compete, not to solicit employees or clients, and not to use or disclose confidential information. Davis was sent the same offer letter and never returned an executed copy of it, although he did accept the job offer via email and commence employment with ESA. Warwick executed a Confidentiality Agreement when he began employment with DVLA, and ESA argues that this contract was assigned to ESA when it purchased DVLA. Assuming, *arguendo*, that Daniels, Davis, Gilbert and Warwick all have validly executed confidentiality agreements with ESA, ESA still cannot prove that it will likely succeed on the merits of a breach of contract claim as to these individuals.

I find no evidence that Daniels, Davis, Gilbert, Weitzner or Warwick breached the terms of any post-employment restrictive covenant that they may have entered. ESA presented evidence that none of these defendants met with ESA to review their laptop and phone upon their resignation, and that some of them deleted emails from their ESA email accounts prior to their resignation. This evidence is minor and clearly insufficient to meet ESA's burden that it will likely succeed on breach of contract claims as to these individual defendants. [4]

ESA also presented evidence that employees contacted numerous ESA customers in the days and weeks after their resignations in an attempt to divert business from ESA.

---

[3] There is some dispute as to whether these agreements were properly entered into by these Defendants with ESA or with another related Ecosave entity, but for purposes of the instant analysis, I will assume these agreements were entered into between the departing employees and ESA.

[4] Even if ESA could prove a likelihood of success on the merits on its breach of contract claims against Daniels, Davis, Gilbert, Weitzner and Warwick, it cannot prove that there is a risk of immediate irreparable harm if these defendants are not enjoined. Any conduct of the five defendants in question that may have breached their non-competes occurred in the past and can be compensated with money damages. Accordingly, ESA also fails the second factor for the grant of injunctive relief.

Pls' Proposed Finding of Fact, ¶¶ 319-320. However, a review of the evidence shows that none of these customer contacts were made by the individuals with non-competes, Davis, Gilbert, Daniels, Weitzner or Warwick. Further, these defendants are not involved in sales and did not attempt to solicit any ESA customers. Gilbert and Daniels are field techs, who have no sales responsibilities. Weitzner is a draftsman who lives and works in New York and has no customer contact of any kind. Davis is an estimator who also does not have customer contacts. Warwick is a project manager and there has been no evidence presented that he has customer contacts. Accordingly, there was no breach by these defendants.

As I have found that ESA is unable to establish a likelihood of success on the merits, I do not need to go further and analyze the additional factors for injunctive relief. Accordingly, ESA's request for injunctive relief due to the alleged breach of contract of Daniels, Davis, Gilbert, Weitzner and Warwick is denied.

Next, I will address the non-solicitation agreement entered by Defendant Dugan. Defendants do not dispute the fact that Dugan has valid, enforceable, non-solicitation agreement with ESA which restricts him from directly or indirectly soliciting any ESA customer or prospective customer. P-10. There is also no dispute that this agreement contains a carve-out that allows Dugan to solicit, directly or indirectly, any customer or prospective customer with whom Dugan did business prior to his employment with ESA. P-10. ESA has presented no evidence that Dugan directly solicited any of its customers. Rather, the issue here focuses on whether Dugan indirectly solicited ESA's customers when former ESA employees, now DVA employees, solicited said customers on behalf of DVA. In essence, ESA is arguing that Dugan's non-solicitation restriction is applicable

to DVA and all its employees because actions of DVA employees would constitute indirect solicitation by Dugan.

There is no caselaw directly on point regarding the indirect solicitation issue. However, several state court cases are instructive in this matter. *Custom Building Systems, LLC v. Nipple,* 2017 WL 4949001 (Pa. Super. Oct. 21, 2017), is cited by Defendants in support of their position that Dugan did not indirectly solicit ESA customers. In that case, Defendant Ron Nipple was fired from his job managing a company. He then formed his own competitor company and hired a number of the prior employer's employees, including some sales personnel who did not have non-solicitation restrictions. Like Dugan, Nipple had a non-solicitation agreement, but not a non-compete. The sales personnel Nipple hired from his ex-employer then successfully went after the ex-employer's customers. Nipple and his company were sued for breach of his non-solicitation agreement on the grounds that he owned and managed the business, and everything done was under his leadership. He was granted summary judgment by the trial court, which concluded that none of the employees of the new company nor the entity itself were prohibited in any way by the contract between Defendant Nipple and his former employer. *Custom Building Systems, LLC v. Nipple*, 2017 WL 11020209 (C.P. Snyder Dec. 30, 2016). The court noted that under such an argument, "[a]ny potential employer of Mr. Nipple would be precluded from sales to the prohibited customers simply by hiring Mr. Nipple regardless of his involvement with sales. This far exceeds the contract's limitations as written." *Id.*, at *3. On appeal, the Superior Court affirmed, holding that:

> … although Icon [the new company] made sales to prohibited customers during the restricted covenant period, no facts of record indicate Mr.

> Nipple was involved in sales to any of CBS' customers; … non-solicitation provision does not prohibit employees of Icon nor Icon itself from contracting with CBS customers; to apply terms of non-solicitation provision per [Icon's] interpretation would effectively prohibit [Nipple] from continuing his career in modular home industry in any capacity; under [Icon's] view, employer in modular home industry that hired Mr. Nipple in any capacity would be unable to sell to prohibited customers during the restricted period….

*Custom Building Systems, LLC v. Nipple*, 2017 WL 4949001, *5.

In response, Plaintiffs cite to *Huntington Bancshares Inc. v. Burke*, 2020 WL 6364755 (W.D. Pa. Oct. 29, 2020) for the proposition that "individuals may not use third parties as puppets to avoid restrictive covenant obligations." Docket No. 19, p. 2.

Burke, the employee-defendant in *Huntington,* was bound to post-employment restrictions on his direct or indirect solicitation of his former employer's customers and employees. Burke was terminated from employment, then he and his father called on Burke's customers from Huntington (his former employer), told them of his termination, and provided an explanation. When Burke eventually joined a new company, he compiled lists of his Huntington customers and provided them to his new employer, Alliant, which sent out email announcements regarding Burke's new employment. Burke also provided Alliant with the names of employees whom he thought "could [be] entice[d] to leave" Huntington, which Alliant used to solicit those individuals for hire. *Id*.

Huntington sued Burke and Alliant, and after a hearing a preliminary injunction was entered, as the judge found a substantial likelihood that Burke breached his covenants with Huntington and Alliant tortiously interfered with Burke's contractual obligations to Huntington. *Id.* This was based on Burke having "directly and indirectly solicited his customers" to join him at his new company, having "confidential and proprietary

information" of his prior employer in his possession well after his termination, and having supplied information about Huntington's customers and employees to Alliant that it used to solicit them for employment and business opportunities competitive to Huntington. *Id.* at *10.

I find the instant situation to be more factually similar to *Custom Building Solutions* than to *Huntingdon*. In *CBS*, the former employee had a non-solicitation agreement with CBS and was fired. His wife and son-in-law then created Icon, a competitor company. Nipple had an office at Icon and Icon made sales to customers that were prohibited by Nipple's non-solicitation agreement. However, there were no facts to indicate that Nipple was involved in sales to any of the restricted customers in any way. The record showed that Nipple merely functioned in an advisory role, and there was no evidence offered that his role exceeded an advisory capacity. The mere fact that Nipple had an office at Icon, created the company, and his family worked there was insufficient to prove indirect solicitation.

*Huntingdon v. Bancshares* is distinguishable from the instant set of facts. Although it involved a former employee with a post-employment non-solicitation agreement, the employee in question, was directly involved in soliciting his former employer's customers. Burke readily admitted that he spoke to most of his customers after he was terminated by Huntingdon and that he "texted, called, email[ed] and/or personally met with Huntingdon customers." *Id* at *5. This type of solicitation is much more direct than the actions of Nipple in the *CBS* case.

To find a former employee engaged in indirect solicitation of his former employer's customers, that employee must make specific acts of personal involvement in the

solicitation. This aligns with courts in some other jurisdictions. *See PCRE v. Unger*, 2010 WL 2364267 (Conn. Super. Apr. 30, 2010) (finding that a bar on indirect solicitation of an individual's prior employer's employees did not prohibit the new employer itself from soliciting and hiring those employees, so long as the ex-employee did not participate in those efforts); *see also Dominion Enters. v. Dataium, LLC,* 2013 WL 6858266 (Tenn. App. Dec. 27, 2013) (finding no indirect solicitation when the new employer, but not the ex-employee, solicited and hired other employees of plaintiff company where "the employee merely had knowledge that a third party was soliciting other employees" and "there was no evidence that the defendant arranged interviews or took other steps to recruit plaintiff's employees.")

In the instant matter, ESA argues that Dugan engaged in indirect solicitation because he started DVA and allowed DVA to solicit ESA customers. However, the evidence of Dugan's participation in DVA's solicitation is minimal. Dugan testified that he did not solicit any ESA employees to join DVA, did not solicit any ESA customers on behalf of DVA, did not assist any DVA employee in soliciting ESA customers, did not encourage any ESA customer not to do business with ESA and has no plans to do any type of solicitation. 3/2/21 hrg, p. 71. Further, not one customer or employee has offered testimony to contradict Dugan's testimony. There is no evidence of Dugan's solicitation on behalf of DVA or his indirect solicitation through direction of his employees.

ESA presented evidence of emails where DVA employees mentioned to others that Dugan was now with DVA as the CEO. 3/2/21 hrg, p. 118. However, Dugan specifically testified that he did not approve or have knowledge of those emails. 3/2/21 hrg, p. 118.

Further, Nace testified that Dugan was not involved in drafting any emails to customers and that Nace did not tell Dugan about them. 3/5/21 hrg, p. 10. ESA failed to present any evidence that Dugan personally assisted anyone else at DVA in soliciting ESA customers. Accordingly, ESA failed to prove that Dugan indirectly solicited in violation of his non-solicitation agreement. ESA does not have a likelihood of success on the merits as to its breach of contract claim against Dugan either; therefore, a preliminary injunction will not issue. As I find that ESA cannot establish a likelihood of success on its breach of contract claims, I do not need to address the remaining factors in the analysis for a preliminary injunction.

### C. Tortious Interference

To set forth a claim for tortious interference with an existing or prospective contract under Pennsylvania law, a plaintiff must demonstrate four elements: (1) the existence of a contractual relationship or prospective contractual relationship between the plaintiff and another party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship or preventing the relationship from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct. *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 727 (E.D. Pa. 2014).

Although there may be tortious interference with business relationships here, I do find that ESA will not suffer immediate and irreparable injury if it is denied injunctive relief as to its tortious interference claim. "Irreparable harm is injury that cannot adequately be compensated by monetary relief." *Coventry First, LLC v. Ingrassia*, 2005 WL 1625042, at *11 (E.D. Pa. July 11, 2005), *quoting Analytic Recruiting, Inc. v.*

*Analytic Res., LLC*, 156 F.Supp.2d 499, 519 (E.D.Pa.2001); *see also Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir.1987). Defendants argue that all ESA's alleged injuries can be compensated through money damages, and I largely agree.

ESA presented extensive evidence that Defendants worked to divert business from ESA by soliciting its customers after the mass resignation occurred. Pl's Proposed Findings of Fact ¶¶ 319, 320. Some existing customers left ESA and took their business to DVA. The departing employees told customers that ESA was no longer involved in the automation business, that ESA had become DVA and that all ESA's employees left and joined DVA. This is arguably interference with customer relationships and would adversely impact ESA's business and goodwill in the industry.

However, despite ESA presenting evidence of loss of goodwill and interference with customer relationships, I note that this type of harm must still be immediate in order to justify injunctive relief. Any loss of goodwill and/or interference with customer relationships that occurred in this matter is now squarely in the past. ESA cannot prove any immediate threat of harm to its reputation or customer relationships presently, almost seven months after the mass resignation occurred. Any harm to its reputation or relationships has already occurred and can properly be compensated for with monetary damages if actionable. Simply put, a showing of past harm, without more, is insufficient to justify the issuance of a present-day preliminary injunction. *Ali v. FCI Allenwood*, 2017 WL 3008545, at * 2 (M.D. Pa. July 14, 2017) ("A preliminary injunction cannot be issued based on past harm," but is instead intended "to prevent future irreparable harm.") (*quoting Fisher v. Goord*, 981 F. Supp. 140, 168 (W.D.N.Y. 1997)). Accordingly, ESA

cannot prove immediate irreparable harm under its tortious interference claim, and its motion for injunctive relief is denied.

Similarly, as to ESA's argument that DVA, Dugan, Nace, ETS and Haggarty interfered with ESA's contractual agreements with its employees, a preliminary injunction will not issue because there has been no showing that ESA will suffer immediate irreparable harm in the absence of such relief. To the degree that Defendants interfered with ESA's contracts by recruiting the departing employees away from ESA, such conduct occurred entirely in the past. Any harm that ESA suffered, such as the departing employees leaving its employment, has already occurred. ESA has not put forth evidence that Defendants are currently interfering, or are an immediate threat to interfere with, ESA's employment contracts. Absent such a showing, injunctive relief will be denied.

As I find that there is no threat of immediate irreparable harm as to ESA's tortious interference claims, I do not need to address the remaining factors of the test for injunctive relief, and ESA's motion for a preliminary injunction will be denied.

### D. Unfair Competition

Unfair competition is the systematic inducing of employees to leave their present employment and take work with another in order to cripple and destroy an integral part of a business, or for the purpose of having the employees commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers, rather than to obtain the services of particularly gifted or skilled employees. *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC,* 13 F. Supp. 3d 465, 476 (E.D. Pa. 2014) (internal quotation marks

omitted) (*citing Albee Homes, Inc. v. Caddie Homes, Inc.,* 417 Pa. 177, 207 A.2d 768, 771 (1965)).

Similar to the analysis above for ESA's tortious interference claim, I find that ESA cannot show that it will suffer immediate irreparable harm if an injunction is not entered in this matter. Any unfair competition that may have occurred when ESA employees left and went to work for DVA occurred in the past. There is no immediate harm that may occur now, almost seven months after the employees' departure. ESA can be made whole through money damages if any unfair competition occurred. Therefore, I do not need to proceed any further with the injunction analysis and ESA's request for injunctive relief is denied.

## VI.  **CONCLUSION**

For all of the above reasons, Ecosave's claim for injunctive relief is denied.[5]

---

[5] I note that despite the instant ruling, Defendant Dugan continues to be bound by the terms of his non-solicitation agreement and must abide by its terms as written.